Task of the Cases, United States v. Holland et al. Good morning. Good morning, Your Honor. May it please the Court, my name is Robert Yudishin and I represent Warren Rosenfeld. And I know from what the, what you said, Judge Marcus, that you are familiar with the briefs and the records. I want to start with the first issue that we've raised in our brief, which has to do with the trial court's refusal to allow Mr. Rosenfeld to call James Bradley as a witness at the trial. And Mr. Bradley was originally proffered as an expert witness in the case, and then based on some issues with Mr. Bradley's bio, it became clear that Judge Garbus was not going to allow Mr. Bradley to testify as an expert, and so Mr. Rosenfeld's trial attorney asked that Mr. Bradley be allowed to testify as a fact witness at the trial. And Mr. Bradley is a withdrew the idea that he was an expert and we're traveling on the sense that he was a lay witness giving opinion testimony. Well, so Judge Garbus took it that Mr. Bradley was going to give opinion testimony, but he really was not being proffered at that point as an opinion expert witness. And the reason for that is the government had put on an expert witness, Mr. Kerr, to really don't exist, and with the implication being because they don't exist, they have to be fraudulent because there is no such thing. And so Mr. Bradley was going to testify as a fact witness that those types of alternative financial instruments exist. I guess here's where I'm having the problem, and maybe you can help me. He wanted to say a bunch of things. Basically there ain't enough evidence. Couldn't do that. Wanted to make some comment about the President's transactions in the financial area. District Court was well within his discretion to say that's far afield. And then we come to what really the heart of it was, which was that he wanted to testify about the availability of this form of financial collateral in the relevant commercial marketplace, right? That's correct, Your Honor. That strikes me as the heart of opinion testimony from an expert. It's not the kind of thing a lay person would know about. It's not the kind of thing that a jury would generally have any inkling about. But to suggest in this peculiar market, commercial market, this kind of collateral financing is a common transaction. That may well be true. But it seems to me that falls beyond the can of just a lay witness. It looks to me, no matter how you disguise it or dress it up, as expert testimony. Maybe it's admissible as expert testimony if it could otherwise get over the other daubered humps. But I don't see how that's lay testimony. Your Honor, it would be just as if the government wants to put a witness on to say a checking account doesn't exist. So I want to call someone and say, no, we do have checking accounts, and I actually have one. Well, this is a little different, right? I mean, there's a sort of a come on response to what you've said. Checking account, everybody and their brother has or has heard of, at least C.D., frankly, before I came into this case, I had never heard of. So to Judge Marcus's point, we're beyond the can of the average layman on the street, right? Well, except that Mr. Bradley wasn't being asked at that point to give an opinion on whether these were a good financial instrument, a bad financial instrument, which really would be the gist of expert testimony, but really just saying these are instruments that are used in financial transactions. Right. But I'm not sure I understand the difference. If I am going to testify about a piece of knowledge that's peculiar to an obscure and limited part of the commercial financial market, and I'm going to say that based on my background training and experience, I can tell you, ladies and gentlemen of the jury, that this is a readily available and commonly used tool in this commercial marketplace, that's a little bit different and it strikes me the stuff of an expert. Let's assume for the purpose of my question that this really fell into the ballpark of expert stuff. Wasn't the judge well within his discretion to keep him out for reasons other than the nature of the opinion, other foundational problems that existed here? Why couldn't the trial judge simply say, I'm not satisfied with this witness for reasons A, B, C, and D? Well, I think Judge Garbus did do that and that's why Mr. Stone at trial said, okay, I'm not going to proffer him as an expert. I want to just testify about these factual matters. Right, so then your whole argument turns you're not challenging that because the defense withdrew Bradley as an expert and traveled on the theory that this was lay opinion testimony, which you said no, it was lay fact testimony. But it strikes me that when you're speaking at that order of generality about what's going down in this kind of marketplace and that this is common, it looks to me a little bit different than I'm a fact witness and I say the light was green or the light was red. I understand there's a qualitative difference, Your Honor, and I would agree with that. I'm sort of, you know, I'm stuck with the fact that Mr. Stone withdrew him as an expert. And I genuinely appreciate that. And so I think when Mr. Stone was trying to get the testimony in because it was critical to the defense to have something along these lines to support Mr. Rosenfeld's testimony and to rebut the government's expert testimony, that he offered it as fact testimony without proffering Mr. Bradley's opinions on whether these were good or bad. And so he was trying to walk a fine line there to get it in. Thanks very much. Mr. Shorstein. Good morning, Your Honors. May it please the Court. My name is Paul Shorstein and I represent Mitchell Holland. And I'd like to discuss the sufficiency issue and then move into how that relates to the issue of the Court erroneously allowing Mr. Kerr, who was the government's expert, to give the opinion he did, one, because he's not qualified, and two, he's not qualified to give that particular opinion and then discuss how that decision was compounded by the District Court disallowing us from bringing our own expert, which, of course, you guys have already begun to discuss. Regarding the sufficiency argument, essentially the issue was whether my client had knowledge of the fraud. We all agree there was fraud. Unistate was a fraudulent entity, thereby the CD was certainly a fraudulent CD. It didn't exist. So the question is whether my client knew that. In my client, he had a business where he was brokering the CD transactions connecting people who wanted to lease a CD with financial institutions who had them available for lease. He openly advertised his business on the Internet and through word of mouth, talking to a lot of different people. And he had customers who would contact him to say, this is what I'd like to do. I would like to lease these CDs. He negotiated contracts with them. They had arms-length contracts with these individuals. These people had an opportunity to review them, to negotiate them, to show them to their lawyers and advisors. And they signed these contracts and entered into this transaction. But, I mean, aren't there enough red flags here for a jury rationally to have concluded that your client knew? I mean, you know, the Chase Manhattan thing hasn't been a bank in a decade. You know, the skew numbers or whatever you call them on the thing are not quite right. No one ever tried to extend the lease beyond the initial 60 days. Some people were complaining that these things weren't working. It just seems like there's an awful lot of smoke here. I mean, there certainly were red flags. But the question is whether those red flags allow a reasonable jury to believe that my client knew. And one other point I wanted to make before I address those specific issues is, you know, once these contracts were entered into, the customers had five business days or ten business days to receive the confirmation and then confirm it themselves, which the contract obligated them to do. And the feedback my client was getting was positive. This guy said he viewed the CD. This guy said they were verified. This guy had his lawyer say, yeah, we've seen the funds or our funding group verified it. Another guy confirmed it. So he's getting confirmation that the CDs are legitimate. Now to your question, if this number's off, there was a Citibank document that was fraudulent. You look at them in a microscope, yeah, that looks bad, but I don't know how the evidence showed that necessarily translates into my client knowing that that's fraud. The few documents that were fraudulent did not come from my client. I think one of them was just sort of emailed through from someone else. We discussed the Q-SIP, the numbers were off, but there was testimony about how those are internal documents, they don't necessarily apply to the CDs. But then the people are, the customers who are responsible for verifying them by contract are saying, we verified it. We confirmed it. Our funding group is in place. These things, which give my client reason to believe that they're legitimate. Now weren't there some people who were giving less positive feedback? Right. And you mentioned that. I want to get to that too. There was one individual, and it was Sayer, who was the primary victim, who did complain. So I don't want to say nobody complained. Everybody else either said nothing, or I think there were four or five people that said, yeah, we verified it. Sayer did complain. But one, this was in February after he signed his contract in November, so we're talking about three months. And two, the nature of his complaint didn't really go to the fraud of the CD.  I can't use it. And you know, once Holland executes his transaction, he doesn't know necessarily what they're going to do. I mean, this is a strange transaction. But these aren't just unsophisticated, inexperienced people he's dealing with. This isn't like that fraud where you're preying on the unsophisticated. Sayer was a very successful businessman that turned nothing into like an $80 million company. These other guys are very experienced in finance and have lawyers and advisors. So there was one person, Sayer, who did complain, as you said. It was three months later. And basically what he's saying is, I can't use this. Now, he didn't really say why he can't use it. Maybe he can't use it just because you bought something or leased something that didn't do what you think it was going to do. But there was no indication specifically of fraud. So going back to your question. Talk to me as well in this conversation about Chase Manhattan. It just seems that we're being asked to assume an extraordinary level of naivete that your guy didn't know that Chase Manhattan had not been a bank in a decade. There was one document, I think you're referring to, related to one of the deals where Chase Manhattan was a critical part of the transaction. In like a BWI or something, right? Right, right. And it turned out- It didn't even exist in BWI. No, it didn't exist. And it wasn't a bank. And it didn't exist in that name. Correct. For quite a while. So here is a document going through your client that reflects the name of a bank that doesn't exist in a location where they never operated on, even when they did exist. Correct. And, you know, again, if you look at that document in a microscope, you're like, that's a problem. And clearly it's a red flag and I agree with you. But again, when you look at these transactions, you've got contracts going back and forth. You've got an escrow contract. You've got confirmation in that kind of document that's coming to the customer. It's not coming from Holland. So we can't say that he created this fraudulent document. How much money was involved in that transaction involving Chase Manhattan Bank BWI? I don't recall specifically. I think what they did was they paid an arrangement fee to get this going. And I think generally we're talking about six figures. I think all of them were at least six figures. You were talking six or seven hundred grand here, weren't you? I wouldn't question that because generally that's what they were. Some less, but yes. I don't know that one would say that it's unfair to infer from the fact that the transaction involved getting paid six or seven hundred thousand dollars that involved a bank that didn't exist under that name for a long time doing business in a location where it never did business. I mean, it was not just some modest little thing. This was a big deal. This was to pay six or seven hundred grand in order to use it as collateral for multiple seven figure loans, right? Yes. I mean, this whole idea about collateral, not necessarily. I mean, people are going to use it for whatever they were going to use it for. It really isn't good for collateral. But you know, these are business people that can use it however they think they can use it in the world of private finance. But yes, that is a big deal, literally. The document that's fraudulent from a bank that's clearly not issuing it is a problem. The issue though is, does my client know based on that document, which we don't know how much he didn't create, and two, we don't know how much exposure he had to it, and when it gets to the other person who is by contract obligated to verify these things and they know they have five, some cases ten business days to get out and get their money back are not doing that. I don't know that anybody complained about that particular document until this all came down and the government got involved. But yes, it is a red flag. Okay. Thank you so much. Thank you. Mr. Glazer? May it please the Court, William Glaser for the United States. Starting with the Crawford defense expert, there are two different theories under which the defendants on appeal have proposed that his testimony was proper. Mr. Rosenfeld's argument was that it was proper lay fact testimony, and Mr. Holland's argument is that it was indeed admissible as an expert, as Mr. Bradley was originally noticed as an expert. I think it's very clear the district court did not abuse its discretion in excluding the proposed expert testimony. That testimony was suspect for a variety of reasons, and essentially, as can be seen from the Crawford expert report, it was conclusions about the inferences that the jury should draw. So if I can focus then on whether this was fact testimony, Mr. Bradley never testified in his proffer, and Mr. Rosenfeld's attorney never in his own proffer, suggested that Mr. Bradley had himself engaged in one of these leased CD transactions. In fact, he said that he was going to testify about how these things existed, how they were feasible, but that was based upon his knowledge in the field, not his own personal experience having actually engaged in a CD transaction. I think it might have been different if he had been called to testify that I have in fact engaged in exactly these kinds of transactions on multiple occasions. That might fall in the realm of fact testimony. However, he never proposed to do that. What he proposed, the district court repeatedly cut him off during the proffer and said, okay, let's get to the fact testimony, let's get to the fact testimony, and he never did. I think if this court reviews Mr. Bradley's proffer, which is in document 348 at pages 11 through 30, and again the defense proffer through the attorney at pages 72 through 77, this court can conclude it would have fallen within the realm of expert testimony and it was not an abuse of discretion to exclude it for that purpose. Turning then to the government's expert and whether or not his testimony was admissible, Mr. Kerr qualified in federal court as an expert 70 times, approximately 70 times before. He had extensive experience with the control of the currency, engaging with similar sort of odd fraudulent schemes. He was someone who had extensive experience and to the extent that the defense challenges his qualifications, I think there was no abuse of discretion. Now if we look at his qualifications to testify to exactly what he testified to, which I understand to be the second component of their argument, he testified that leased CD transactions are quote unquote not feasible or do not exist in the commercial banking world. He reached that conclusion by testifying that in his experience, no one would lend money against a CD where that money, the CD could not serve as collateral. That was his testimony. That look, if this, no one would lend money to a leased CD because the person who's leasing it actually doesn't have access to those funds. I think that's a common sense conclusion and I think Mr. Kerr was qualified based on his experience to testify to that. But as I mentioned, it's a common sense conclusion and therefore I think that goes to harmlessness. That even if Mr. Kerr's testimony should not have been admitted, even if it was an abuse of discretion, that any error was harmless because the jury could itself infer from all of the other facts that these sort of transactions don't exist. They could not actually function as advertised by the defendants. So then if I may briefly touch on the sufficiency of the evidence. There were many facts from which the jury could conclude that the evidence was sufficient. Again, this court is reviewing under the deferential Jackson versus Virginia standard. There are certainly theories that the defense has proposed as to why Mr. Holland was unaware of the fraudulent nature of these transactions. He asserts that he relied on good faith. But there were enough red flags that the jury could look at that and reject it. There was the fact that no one ever followed up and paid the additional amounts that they were supposed to. There was the fact that numerous clients complained that they were unable to obtain lending. There was the fact that the both defendants in this case received disbursements from escrow before the five-day period, which again can indicate an intended fraud. In fact, they obtained the escrow funds in one case two days before the fake CD was actually issued. There were problems with the CDs themselves. All of them were fake. I think that someone, Mr. Holland points to the sophistication of the victims, but someone in Mr. Holland's position who is advertising that he has extensive experience in this area, he was himself sophisticated or should have been sophisticated enough to realize that he was engaging in fraud. So the jury could infer from all of the evidence that Mr. Holland was guilty of the alleged fraudulent scheme. If the court has no further questions, I'm happy to yield my time. Thank you very much.  Let me go back maybe to Rule 701 and the Federal Rules of Evidence. A lay witness under Rule 701 is allowed to testify about matters rationally based on their perception and that are helpful to an understanding of the facts. I mean, essentially a relevance test under Rule 701. So Mr. Bradley in the proffer that Mr. Glazer refers to was proffered as a fact witness and Mr. Stone told the court that Mr. Bradley could speak specifically about his knowledge of the facts and that they are indeed used in funding and in finance, talking about lease CDs. And then he went on to say Mr. Bradley would be able to explain how business in this type of financial world exists and how lease CDs, standby letters of credit, proof of funds and bank guarantees are used every day in the financial world, not in the traditional banking side, which Mr. Kerr, on behalf of the government, has testified they are not used in traditional banking, but in other areas of high wealth individuals or high net worth individuals of head funds and venture capital and things of that nature. Did Bradley ever suggest in words or substance that he had been involved in transactions of this kind, not in this transaction, but this kind of financial instrument? Well, so he never testified about that in the proffer and Judge Garbus did cut off the connection and so it ended up with Mr. Stone. But the counsel never asserted and even in the opinion that he had submitted originally, the expert opinion, he never said, did he, that he had ever been involved personally in this kind of financial transaction? No, I mean, the report talked about opinions and did not say that. No, I understand. So, so he's offering an opinion not based upon his particular observation of this kind of transaction himself. So it has to be of a more general and abstract kind, it seems to me. Maybe I'm missing that. Yeah. So I think if you read, I mean, he did testify some in a proffer outside the presence of the jury and then that proffer was supplemented by the trial attorney. And I think if you put that together with what both of those parts that Mr. Bradley had been involved with these types of financial instruments, not in this particular case, I mean, it was clear he wasn't involved with Mr. Rosenfeld or Mr. Holland in these matters, but was proffered because he was familiar with these types of financial instruments and based on his background, both as a lawyer and he had been in banking and degrees in finance, he was familiar with them. It's my understanding that in the proffer that Holland made regarding Mr. Bradley, that he failed in the proffer to establish that Bradley had any actual experience in using lease instruments as collateral for loans. I believe Mr. Bradley testified, Your Honor, that he was familiar with lease CDs being used as collateral, but then that's part of where his testimony got cut off by the district court. Saying I'm familiar with and I have some actual experience in this are two different things, counsel. And I agree with the court. And I think it wasn't developed. If you read that whole proffer, Judge Garbus was impatient with the proffer and kept cutting off the testimony and then it was sort of summarized by the lawyer. But I think it's reasonable based on the report, the testimony, the summary, Mr. Bradley's background that when he's saying he's familiar, it's not just because he's heard about it somewhere that he's dealt in the world of finance, both in alternative finance and traditional finance and could talk about the use of these instruments in the alternative financial world. Thank you, counsel. Thank you. Mr. Bishop. Your Honors, just to rebut the government, just in wrapping up the point about sufficiency, you know, the way it appeared is that there just was not direct evidence that my client knew and I understand there were red flags and circumstantial evidence. But given the due diligence that he did, his constant and, well, extensive communication with someone who appeared to be from Unistate, asking a lot of questions by email and getting answers that seemed to indicate this was a legitimate transaction concept, and again, the feedback he was getting just led us to believe that there's just insufficient evidence to prove that specific element of knowledge. And what the government did, we believe, to sort of circumvent that problem of having to prove that specific element is bring in Kerr to say, well, these things can't exist. And if they can't exist, it must be fraud. So basically what that does is shift the focus away from the government having to specifically prove that Holland knew Unistate was a fraud and knew these CDs were fraud to, well, he had to have known because this thing just doesn't work and it doesn't exist and it has to be fraud. So it sort of prevented him from having to prove that specific element. And that's what Kerr did with that broad, general sort of negative opinion that somehow he knows in the entire world of all the people executing private contracts and finance that nobody could do this or nobody would do this, despite the fact that the government put on witness after witness after witness who were the victims, who are working in finance and are educated and experienced, who were there to say we're going to do that very thing. We paid a lot of money to lease CDs knowing what we planned to do with them. It didn't work and obviously it was fraud. But Kerr's opinion is rebutted by their own witnesses, which makes it misleading to the jury and shifts the focus away from what they have to prove. And then that's compounded by the fact that we can't put on Bradley who can offer another opinion rebutting Kerr. So you've got their victims who are saying one thing, you've got Kerr who's not qualified saying another, and we should have a right to clear up that confusion and how they misled the jury by bringing our own witness who does have experience in private finance to say here's what we believe, here's my expert opinion, and these things can't exist, Your Honor. Thank you very much. Thank you all. I note, Mr. Shorstein, that you were court appointed and we very much appreciate you taking on the burden of vigorously representing your client. We thank you all for your efforts. This court is adjourned. Thank you.